IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID HIGHTOWER                    :          CIVIL ACTION
                                   :
       v.                          :
                                   :
EASTON AREA SCHOOL DISTRICT        :          NO. 09-5730

MEMORANDUM

Dalzell, J.                                 September 30, 2011

          Plaintiff David Hightower ("Hightower") sues the Easton

Area School District ("EASD" or the "District"), asserting claims

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e, et seq., and the Pennsylvania Human Relations

Act ("PHRA"), 43 Pa. Stat. Ann. § 951, et seq.

          Hightower works as a principal with EASD, and alleges

that the District subjected him to a hostile work environment and

discrimination as to promotions and discipline, as well as

retaliatory harassment when Hightower complained about

discriminatory conduct by the District.  EASD has filed a motion

for summary judgment, to which Hightower has responded.  For the

reasons set forth below, we will deny EASD's motion.


I.    **Factual Background**

          Under Fed. R. Civ. P. 56(a), "[t]he court shall grant

summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." Bello v. Romeo, 424 Fed. Appx. 130, 133 (3d Cir. 2011).  We will thus begin by reciting the undisputed facts in this matter, and then consider the disputed facts that the parties have supported with specific citations to the record.  In so doing, we will keep in mind that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009), and that we should not credit statements in affidavits that "amount[] to (i) legal argument, (ii) subjective views without any factual foundation, or (iii) unsupported assertions made in the absence of personal knowledge." Reynolds v. Dep't of Army, 2011 WL 2938101, at *2 (3d Cir. 2011).

As will be seen, this action involves a long and complicated factual background, as evinced by defendant's and plaintiff's statements of facts and their submissions (accompanied by seven and thirty-eight exhibits, respectively). Our canvass of the record, especially in light of the hostile work environment claim, will necessarily be fact-intensive.

2

A.   **The Undisputed Facts**

The parties agree on the essential details of
Hightower's employment history with the District.  Hightower is
an African-American man, Pl.'s Compl. ¶ 9; Def.'s Ans. ¶ 9, who
began his employment at EASD in 1989 as a physical education
teacher.  Def.'s Statement of Material Facts ("Def.'s Facts") ¶¶
1; Pl.'s Statement of Material Facts ("Pl.'s Facts") ¶¶ 1.
Hightower became an Assistant Principal with EASD in 1996, and
after two and a half years in that position (at Cheston and
Palmer Elementary Schools), he advanced to the position of
Principal of Paxinosa Elementary School in 1999.  Def.'s Facts ¶¶
2-4; Pl.'s Facts ¶ 2-4.  Hightower still holds this latter
position.  Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4.

In 2002, Hightower applied for a position as the
Director of Human Resources at EASD and interviewed for the
position with Tom Evans (the former Superintendent of EASD) and
Dennis Riker[1] ("Riker") (the Director of Human Resources at
EASD).  Def.'s Facts ¶¶ 10-11; Pl.'s Facts ¶¶ 10-11.  EASD also

_____

[1] In 2002, Riker was Director of Human Resources at
EASD.  Def.'s Facts ¶ 11; Pl.'s Facts ¶ 11.  Plaintiff further
explains that from 2003-04 through March of 2007, Riker was
District Superintendent.  Pl.'s Facts ¶ 62 (citing Riker Dep. at
11).  Riker is a white man.  Id. (citing Riker Dep. at 5).

interviewed two other candidates, John Castrovinci and Linda Marcincin, but the District ultimately hired none of these people, instead selecting Joseph Kish, a white man.[2]  Def.'s Facts ¶¶ 12-14; Pl.'s Facts ¶¶ 12-14, 60.   In 2007, Hightower again applied for the Director of Human Resources position, listing Kish as a reference on his application.  Def.'s Facts ¶¶ 16-17; Pl.'s Facts ¶¶ 16-17.  Hightower interviewed twice for the position with a team of EASD administrators that included Riker, Kish,[3] Gregory Shoemaker,[4] Guy Greenfield, and a few others.

---

[2] Hightower notes that Kish was Acting Superintendent from May of 2007 to May of 2008, Pl.'s Facts ¶ 60 (citing Ex. 13 to Pl.'s Facts ("Kish Dep.") at 33), and served as Assistant to the Superintendent under Riker and Susan McGinley.  Id. (citing Kish Dep. at 28-40).  The record also reflects that Kish was Acting Superintendent in 2005.  Kish Dep. at 32.  Hightower contends, relying on Riker's deposition, that Kish was perceived as intimidating at the District, Pl.'s Facts ¶ 60 (citing Ex. 2 to Pl.'s Facts ("Riker Dep.") at 26), and presents testimony by Myers that Kish intimidated everyone at the Board except Myers.  Id. (citing Ex. 16 to Pl.'s Facts ("Myers Dep. I") at 25).  We will accept both these assessments as within the personal knowledge of the deponents, and regard them as admissible.

[3] While EASD does not list Kish as one of the persons who interviewed Hightower, Hightower states that Kish participated in interviews for the position, if not in Hightower's interview specifically.  Pl.'s Facts ¶ 18 (citing Ex. 14 to Pl.'s Facts ("Monroe Dep. II") at 13).

[4] According to Hightower, Shoemaker is a white man who was Director of Elementary Education from 2005 until 2009.  Pl.'s Facts ¶ 61 (citing Shoemaker Dep. at 15, 28).

4

Def.'s Facts ¶¶ 18-19; Pl.'s Facts ¶¶ 18-19.  However, EASD did

not hire Hightower as Director of Human Resources, instead

selecting LaToya Monroe, an African-American woman.  Def.'s Facts

¶¶ 20-21; Pl.'s Facts ¶¶ 20-21.

Hightower also applied that year for the position of

Director for Support Programming at the District, listing Kish,

Shoemaker, and Guy Greenfield as references on his application

because they had knowledge of his skills and abilities.  Def.'s

Facts ¶¶ 23, 25; Pl.'s Facts ¶¶ 23, 25.  Hightower interviewed

for the position with EASD administrators, including Riker,

Shoemaker, Kish, Greenfield, and Angela Donaldson, Def.'s Facts ¶

24; Pl.'s Facts ¶ 24, but the District did not hire him, instead

choosing Susan McGinley, a white woman.  Def.'s Facts ¶¶ 26-27;

Pl.'s Facts ¶¶ 26-27.  Finally, on March 20, 2008, Hightower

applied to be Superintendent of Schools for EASD, submitting his

application only to the Pennsylvania School Boards Association

("PSBA").  Def.'s Facts ¶ 31; Pl.'s Facts ¶ 31.  He was not

interviewed for the position, and had no conversations with any

PSBA representatives as to why he was not interviewed.  Def.'s

Facts ¶¶ 32-33; Pl.'s Facts ¶¶ 32-33.

B.    **The Disputed Evidence**

While the parties do not <u>disagree</u> as to the existence

of many facts,[5] Hightower alleges an array of <u>additional</u> factual

details pertaining to his relationship with EASD that are not

found in the District's statement of facts.  These facts pertain

to (1) the decision-making processes governing the above hiring

choices; (2) racially discriminatory behavior by EASD

administrators; (3) complaints that Hightower registered with

EASD administrators about perceived discrimination at the

District; and (4) harassment that Hightower experienced at EASD.

1.    **The District's Hiring Process**

As a prefatory matter, with respect to the hiring

choices described above, Hightower claims that he was qualified

for each central office position for which he applied.  Pl.'s

Facts ¶ 94 (citing Riker Dep. at 47-48; Ex. 4 to Pl.'s Facts

("McGinley Dep.") at 135).  Hightower alleges that Kish got the

---

[5] To be sure, EASD challenges <u>some</u> of Hightower's
supported factual assertions.  As we note below, however, at the
summary judgment stage we "'draw all reasonable inferences in
favor of the nonmoving party, and [we] may not make credibility
determinations or weigh the evidence.'"  <u>Eisenberry v. Shaw
Bros.</u>, 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quoting <u>Reeves v.
Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)).
Where Hightower has supported his factual assertions, then, we
make no mention of defendant's contrary allegations.

Director of Human Resources position in 2002 despite not having

applied or interviewed for the position.[6]  Pl.'s Facts ¶ 14

(citing Kish Dep. at 267-68).  Hightower also claims that

sometime in 2003 or 2004, Riker placed Donaldson, a white woman,

in charge of Human Resources at EASD without posting this

position or soliciting an application from Hightower, though

Donaldson held no degrees related to human resources, had no

human resources certifications, and was not a college graduate.

Id. (citing Riker Dep. at 16-18).  Both parties agree that after

Hightower interviewed for the Director of Human Resources

position in 2002, Kish met with Hightower and suggested that he

take a position as an assistant principal at Easton Area High

School as a way of gaining more experience for a central office

position, Def.'s Facts ¶ 15; Pl.'s Facts ¶ 15.  Hightower adds,

without factual support other than the hearsay statements of

another principal in the District, that such a move would have

been "a demotion from which he would not recover in his efforts

---

[6] Hightower claims that Kish did not know basic human
resources statutes and could not identify whether basic fact
patterns violated EASD discrimination policies, Pl.'s Facts ¶ 92
(citing Kish Dep. 139-47), but, in the testimony to which
Hightower cites,  Kish fluently answered a variety of
hypotheticals pertaining to discrimination.

to be promoted."  Pl.'s Facts ¶ 15 (citing Ex. 1 to Pl.'s Facts ("Hightower Dep.") at 94-95).

As for Hightower's application in 2007 for the position of Director of Human Resources, he adds that though this selection process resulted in the hiring of Monroe, an African-American woman, it was nonetheless discriminatory in that at least one white applicant, Castrovinci, was videotaped during his interview while Hightower's interview was not videotaped.  Pl.'s Facts ¶ 22 (citing Hightower Dep. at 157-58).  Castrovinci is a white man.  Id. ¶ 64 (citing Ex. 6 to Pl.'s Facts ("Castrovinci Dep.") at 6).  However, Hightower's contention that Castrovinci's interview was taped rests on inadmissible hearsay statements Castrovinci made to Hightower.  Id. ¶ 22.  Hightower further explains that though the District ultimately hired Monroe as Director of Human Resources in September of 2007, the EASD Board decided not to renew her contract a year later, in May of 2008.  Id. ¶¶ 22 (citing Ex. 15 to Pl.'s Facts ("Myers Dep. II") at 7), 65 (citing Ex. 3 to Pl.'s Facts ("Monroe Dep.") at 9-10).  Hightower suggests, relying on testimony from Kerry Myers -- a member of the EASD Board, Pl.'s Facts ¶ 60 -- that the Board opted not to renew Monroe's contract because "'she exposed racism

in the district.[7]  And when she exposed racism in the district,
the immediate response of certain board members at that time was
let's fire the person who did it.  The minute they found out it
was Joe Kish and Lou Coxe, they were like rabid animals, they
turned against her.'"  Pl.'s Facts ¶ 22 (quoting Myers Dep. II at
18).  Since this statement is a subjective characterization of
the motivations of third parties made without any grounding in
concrete facts as to which Myers had personal knowledge, we will
not consider it.  Hightower also explains that after Monroe was
released, the District named Castrovinci Interim Director of
Human Resources, and later Director of Human Resources, without
advertising the positions or giving Hightower the opportunity to
interview for them.[8]  Pl.'s Facts ¶ 22 (citing Castrovinci Dep.

---

[7] Monroe wrote two letters to the President of the EASD
Board describing racist conduct at the District.  Pl.'s Facts ¶
68 (citing Monroe Dep. at 10-24; Ex. 22 to Pl.'s Facts ("Monroe
Memo I"); Ex. 23 to Pl.'s Facts ("Monroe Memo II")).  Hightower
claims that Monroe was replaced by Kish, "a known racist," Pl.'s
Facts ¶ 80, but the evidence he presents suggests that
Castrovinci actually replaced her.  Myers Dep. II at 18.
Hightower also presents evidence that no genuine investigation
was ever conducted of Monroe's allegations.  Myers Dep. at 30.

[8] While Hightower also claims, with citations to
Castrovinci's deposition, that "there w[ere] no . . . interviews"
when Castrovinci was named Interim Director, Pl.'s Facts ¶ 22
(citing Castrovinci Dep. at 39-43), Castrovinci actually
testified only that "I'm not aware if they interviewed other
(continued...)

at 41).  Hightower suggests (again relying on Myers's testimony)
that Castrovinci "had no qualifications to be a Director of Human
Resources when he was appointed," id. (citing Myers Dep. II at
18), but because Myers offered no factual basis for this broad
statement and did not specify what he considered to be an
appropriate qualification, we will not consider the statement.

Turning to Hightower's application for the position of
Director of Support Programming in 2007, Hightower suggests that
McGinley "received the position because of how she looked and . .
. that she didn't even apply for the position." Id. ¶ 28 (citing
Hightower Dep. at 110-111).  Because Hightower predicates this
assertion on hearsay statements Kish made to him, we will not
consider it further, though we note that Hightower's suggestion
omits details included in the testimony[9] on which it rests that
deflate much of the alleged statement's racial import.  Hightower

_____

[8](...continued)
people."  Castrovinci Dep. at 41.

[9] In Hightower's deposition, he explained that "[Kish]
said, 'Well, then she came in, she came in looking -- looking
like a librarian, a bookkeeper, hair pulled back in a bun,
looking very studious.'  And when he made that statement to me,
that told me, okay, there's no way in the world I -- my hair's
the same length as it is now, that I was going to be able to pull
my hair back in a bun and then look -- look as she did during the
interview."  Hightower Dep. at 111.

also claims that he had to submit a writing sample in his application, while McGinley was not required to do so.  Id. (citing McGinley Dep. at 28-30).  Because Hightower offers no citation to any materials demonstrating that he was obliged to submit such a sample,[10] we will not consider this allegation in ruling on EASD's motion.  Hightower also avers that Kish instructed him on "what appropriate clothing would be to wear to his interview for the Director of Support Programs, as if, Mr. Hightower, a black man, would not know how to dress for an interview."  Id. (citing Hightower Dep. at 44).

Finally, regarding Hightower's 2008 application for the position of Superintendent of Schools for the District, Hightower explains that both the PSBA and members of the EASD Board participated in the selection process.  Pl.'s Facts ¶ 31 (citing Ex. 21B to Pl.'s Facts ("Vulcano Memo")).  Moreover, though the District suggests that it ultimately hired McGinley for the position, Def.'s Facts ¶ 34 (citing Ex. 1 to Def.'s Facts

---

[10] In McGinley's deposition, her interlocutor appears to present her with a writing sample that Hightower prepared and to contend that Hightower was required to submit this sample along with his application.  McGinley Dep. at 28-29.  Needless to say, such indirect suggestions by a party's counsel, uncorroborated by anyone with personal knowledge of the matter in question, do not put a fact in play for summary judgment consideration.

11

("Def.'s Hightower Dep.") at 125-26), Hightower disagrees,
asserting instead that McGinley was first appointed Acting
Superintendent in May of 2008 -- a position that was not posted,
and for which no interviews were conducted.  Pl.'s Facts ¶ 34
(citing McGinley Dep. at 56-61).

Hightower also contends that McGinley was then
appointed Superintendent in August of that year, id. (citing Ex.
21H to Pl.'s Facts ("Board Minutes")), even though she did not
submit her application by March 20, 2008, id. (citing McGinley
Dep. at 65), when the deadline for applications was that date.
Id. (citing Ex. 21A to Pl.'s Facts ("Superintendent Application")
at P000469).  Though the parties agree that McGinley had central
office experience which Hightower did not have, Def.'s Facts ¶
35; Pl.'s Facts ¶ 35, Hightower also claims, with supposed
support from Monroe's testimony, that McGinley became Acting
Superintendent by "'divine ordination'" and "'magic.'"  Pl.'s
Facts ¶ 35 (citing Monroe Dep. at 35)).  Hightower further
asserts, relying on Myers' testimony, that "the failure to
provide Plaintiff with even an interview for the position of
Superintendent was not fair."  Id. ¶ 32 (citing Ex. 16 to Pl.'s
Facts ("Myers Dep.") at 38.  Unfortunately, Hightower does not
attach to his submission the page of Monroe's deposition from

12

which he quotes.  Moreover, his summary of Myers's testimony does
not appear to represent it fairly, since the cited pages from
Myers's deposition reveal that he merely responded in the
affirmative to the question, "Would you agree with me that you
did not believe the hiring of Ms. McGinley as the superintendent
was fair?"  Myers Dep. at 38.  In any case, the opinions
attributed to Monroe and Myers upon which Hightower relies are
unsupported, vague, and entirely subjective; they consequently
carry no weight as we rule on EASD's motion for summary judgment.

### 2.   Racially Discriminatory Behavior at EASD

Hightower identifies an array of evidence that
allegedly demonstrates racially discriminatory animus by EASD
administrators.  We may divide this evidence into three
categories: (1) evidence of racist policies, (2) evidence of
racist language, and (3) awareness of racism by others.

Hightower asserts that six policies at EASD reflected
racially discriminatory motivations.  First, although Hightower
agrees that Riker, the then-Superintendent of EASD, organized a
meeting with the National Association for the Advancement of
Colored People ("NAACP") and Shiloh Baptist Church to encourage
minority candidates who were interested in working for the EASD,

Def.'s Facts ¶ 42; Pl.'s Facts ¶ 42, he alleges that the District

circulated a "Minority List" and a "Courtesy Interview Memo" to

principals and administrators.  Pl.'s Facts ¶ 42 (citing Ex. 11

("Minority List") and Ex. 12 ("Courtesy Interview Memo") to Pl.'s

Facts).  The Memo states, in relevant part, that

> There are certain individuals that are to be
> given "a courtesy interview."  That file is
> located in the Human Resource Office and
> should be looked at first.  Minorities are
> included in this file.  We have been trying
> to hire qualified minorities to fill
> positions.  I have been working closely with
> the NAACP and they have accompanied me to
> recruiting job fairs.

Courtesy Interview Memo at 2.

Hightower asserts first that, according to Monroe's

testimony, "the Minority List and the efforts to hire minorities

was [sic] nothing more than a 'farce.'" Pl.'s Facts ¶¶ 42-43

(quoting Monroe Dep. at 65).  In Monroe's deposition, she

elaborated that her judgment that the List was a "farce" was

based on "the absence of contact information from that list,"

which "show[ed] that the entire listing is a farce.  It's a

facade.  There was no way to contact anyone to be given a

courtesy interview or subsequently hired."  Monroe Dep. at 65.

Hightower also relies on Monroe's testimony to support the claim

that "[n]o candidates from the Minority List were hired," Pl.'s

14

Facts ¶ 42 (citing Monroe Dep. at 44) -- though Monroe's

deposition actually states only that she did not hire any

minority teachers during her tenure with EASD.  Monroe Dep. at

44.  Hightower next states that in the judgment of Riker, the

Courtesy Interview Memo was discriminatory.  Pl.'s Facts ¶ 43

(citing Riker Dep. at 56).  Because Riker did not explain in his

testimony why he believed that circulation of the Memo was

"discriminatory," Riker Dep. at 56, we will disregard this

conclusion as an unsupported subjective opinion.  Finally,

Hightower explains that "[t]he Minority List, itself, highlighted

names for people to be granted courtesy interviews, although none

of the names have certifications to teach in the Commonwealth of

Pennsylvania; meanwhile, the names of applicants who did have

certifications to teach in Pennsylvania were not even offered

courtesy interviews."  Pl.'s Facts ¶ 42 (citing Minority List and

Kish Dep. at 233-35).

It is true that the List identifies three of the fifty-

five candidates listed with the bold, underlined label

"**INTERVIEW**," that none of these three candidates is listed as

possessing Pennsylvania certifications, Minority List at 1-3, and

that Kish confirmed in his deposition that three of the

candidates on the list who <u>were</u> notated as having such

certifications were not marked with the "**INTERVIEW**" label.  Kish

Dep. at 234-35.  But Hightower has pointed to no materials in the

record supporting his contention that the List identified <u>all</u>

those who were to be granted courtesy interviews with the

"**INTERVIEW**" label, or that <u>none</u> of those with certifications on

the list was given such interviews.  Because we do not find these

latter contentions to be reasonable inferences to be drawn from

the record, we decline to do so and will ignore these claims.

The second policy at EASD that Hightower identifies as

racially discriminatory involves what he describes as

"resegregation in the school district."  Pl.'s Facts ¶ 45.

Hightower explains that the District moved "his elementary school

from the suburbs to the inner city," <u>id.</u>, noting that in 2008,

EASD was 38.94% minority and 61.06% white, <u>id.</u> (citing Ex. 43 to

Pl.'s Facts ("Newspaper Article") at 2), while in 2010, Paxinosa

Elementary School was 64.43% minority and 35.56% white.  <u>Id.</u>

(citing Ex. 44 to Pl.'s Facts ("Enrollment Summary")).  Our Court

of Appeals has explained that "[o]rdinarily, when offered to

prove the truth of the matters stated therein, newspaper articles

are held inadmissible as hearsay."  <u>May v. Cooperman</u>, 780 F.2d

240, 262 n.10 (3d Cir. 1985).  Moreover, Hightower has presented

no evidence attesting to the authenticity or accuracy of the

16

"Enrollment Summary" upon which he relies to establish the racial composition of Paxinosa Elementary School.

Because Hightower's assertions as to the composition of EASD and Paxinosa Elementary School are unsupported by references to admissible materials in the record, we cannot accept them. However, Hightower also explains, relying on his own affidavit, that "[t]he only school [in the District] that was moved and not returned was Mr. Hightower's school, Paxinosa. This resulted in Paxinosa's being moved from a white upper-middle class area to an inner city location," Pl.'s Facts ¶ 48 (citing Hightower Aff. ¶ 19). In the affidavit Hightower also characterizes Paxinosa Elementary School as "a predominately [sic] minority elementary school." Hightower Aff. ¶ 22. Hightower further alleges that "$11 million[11] was spent on renovating Mr. Hightower's school's old building; students from affluent, suburban areas were transferred into Mr. Hightower's old building . . . Mr. Hightower was moved to an inner city location with a dilapidated, old building that needed work, which was not done." Pl.'s Facts ¶ 49 (citing Hightower Dep. at 66-78). We would presume that

---

[11] Hightower in fact appears to misstate the amount spent on renovations, since his deposition identifies this amount as $17 million. Hightower Dep. at 68.

Hightower, as an EASD administrator and Principal of Paxinosa

Elementary School, would have personal knowledge of these facts,

so we will accept these contentions as supported by the record.

The third racially discriminatory policy that Hightower

describes is the District's policy regarding Family and Medical

Leave Act ("FMLA") leave.  Both parties agree that EASD has an

FMLA Policy No. 335, which states that

> The district will require medical
> certification to support a claim for leave
> for an employee's own serious health
> condition or to care for a seriously ill
> child, spouse, or parent. . . . For leave to
> care for a seriously ill child, spouse or
> parent, the certification must include an
> estimate of the amount of time the employee
> is needed to provide care.

Def.'s Facts ¶ 51 (quoting Ex. 3 to Def.'s Facts ("FMLA Leave

Policy") ¶ 3); Pl.'s Facts ¶ 51.  Hightower alleges, however,

that he was required to provide FMLA information to the EASD

Board as well as to the Director of Human Resources, Pl.'s Facts

¶ 50 (citing Hightower Dep. at 131-34), while white employees

were not required to provide medical information to the Board.

Id. (citing Monroe Dep. at 32-33).  Since these claims are based

on the testimony of Hightower and Monroe, the former Director of

Human Resources, we will accept them as founded on personal

knowledge, though we note for completeness that Monroe testified

18

that she never processed FMLA leave for <u>any</u> white <u>principals</u>.

Monroe Dep. at 33.  Hightower also alleges that Shoemaker

attempted to complain to Monroe regarding Hightower's use of

leave.  <u>Id.</u> (citing Monroe Dep. at 51).[12]

The fourth allegedly racially discriminatory policy

involves Shoemaker's assignment of readings to EASD principals.

The parties agree that two or three times a year all elementary

school principals were obliged to read articles on education.

Def.'s Facts ¶¶ 54-55; Pl.'s Facts ¶¶ 54-55.  Hightower explains,

however, that Shoemaker required him to read these articles and

then meet individually with Shoemaker to discuss them.  Pl.'s

-----

[12] We will also record here that, according to
Hightower, he "was subjected to public criticism for absences he
took as a result of medical conditions and accused of looking
deceitful as a result of his being unhappy with the criticism."
Pl.'s Facts ¶ 89 (citing Hightower Dep. at 188-90).  We note
first that nowhere in Hightower's testimony is a connection drawn
between the alleged public criticism, Hightower's unhappiness,
and consequent accusations of deceit.  We also observe that
Hightower stated the following in his deposition: "[i]n an
administrative meeting Dr. Greenfield . . . looked at me and
said, 'David, you have a look of askance on your face.'  And we
went -- well, I went back, looked up the definition, and it's
basically a person who has a look of deceit, distrust."
Hightower Dep. at 188-89.  According to the definitive dictionary
of the English language, "to look askance" is a phrase used "to
indicate disdain, envy, jealousy, and suspicion."  I <u>Oxford</u>
<u>English Dictionary</u> 689 (2d ed. 1989).  Greenfield's statement
could only have meant, thus, that Hightower looked as though he
felt <u>Greenfield</u> was worthy of suspicion or disdain, not as though
he <u>himself</u> was deceitful.

Facts ¶ 56 (citing Hightower Dep. at 143-44).  Hightower further

notes -- relying on Shoemaker's own deposition -- that he was not

on a written performance improvement plan, and that Shoemaker did

not require any white principal who was not on such a plan to

meet with him individually to discuss the articles.  Id. (citing

Ex. 10 to Pl.'s Facts ("Shoemaker Dep.") at 65-66).

　　　　Finally, Hightower alleges that on one occasion, after

work hours, Shoemaker by e-mail scheduled one of these meetings

for 8:00 a.m. the following morning, though Hightower was

attending an administrative conference outside the District on

both days, id. ¶ 56 (citing McGinley Dep. at 107-08; Ex. 33 to

Pl.'s Facts ("Shoemaker's Reprimand")) -- though it bears noting

that the e-mail to which Hightower refers actually states,

"Please remember that as per our conversation during the meeting

we had about your evaluation, we are scheduled to have a

discussion . . . [at] 8:00 AM tomorrow in my office."

Shoemaker's Reprimand (including as history the previous e-mail).

Hightower missed the meeting because he was attending the

conference, id. (citing Hightower Dep. at 146), but he claims

that Shoemaker nonetheless provided him with a "written

reprimand," copied to the Superintendent.  Pl.'s Facts ¶ 56

(citing Shoemaker's Reprimand).  Hightower has included this

20

communication in the record, but we observe that it states only,
in relevant part, that "I need to point out that you had the
opportunity to communicate with me on Thursday at the Workshop
that you weren't going to have the time and to reschedule the
date and time of our meeting.  As I pointed out to you during the
review of your evaluation you need to communicate more
effectively."  Shoemaker's Reprimand.

        Fifth, Hightower suggests that the District had a
"practice of delivering discipline notices to black employees via
armed police officers, while it did not do so with white
employees."  Pl.'s Facts ¶ 76.  Hightower relies on testimony by
Monroe as to the manner in which she was released from employment
-- which involved being escorted by two armed guards, Monroe Dep.
at 49 -- as well as the deposition of Louis Coxe, the white
Security Coordinator and Chief of Police for the District from
2003 to the present.  Id. ¶ 66 (citing Ex. 31 to Pl.'s Facts
("Coxe Dep.") at 14).  Coxe explained that he delivered a
disciplinary letter to Cliff Ransom -- a black EASD employee and
volunteer football coach -- during football practice while
accompanied by two police officers, Coxe Dep. at 64-66, and
conceded that he had never "deliver[ed] a discipline letter to
any white employee with another police officer with [him] and two

21

municipal police officers standing in the vicinity based on [his] request." Id. at 67. Hightower also notes that Coxe instructed Art Statum, a black security guard, "to stand behind a piece of tape in a lunchroom," Pl.'s Facts ¶ 76 -- an allegation that Coxe corroborated in his deposition, and to which he added that he had never "directed any other security officer or policeman to stand behind a piece of tape in a school." Coxe Dep. at 51.

Hightower also suggests that, unlike other principals, he was not allowed to manage his own staff at Paxinosa Elementary School. When Statum worked at Paxinosa and walked with a walker, Hightower sought to accommodate Statum's disability by requesting insertion of a buzzer to open doors automatically. Kish and Coxe denied this request. Pl.'s Facts ¶ 76 (citing Hightower Dep. at 179-81). Moreover, during the 2008 school year, Hightower attempted to move a security officer from an office in his building to another office because the first office was well-located for a particular teacher and group of students. Kish and Coxe overrode this decision. Id. ¶ 85 (citing Hightower Dep. at 185-87). Hightower finally suggests, based on a phone conversation he had with Myers, that the EASD Board was aware that Shoemaker did not permit Hightower to hire his own staff members, while other elementary school principals who were white

were permitted to do so.  Id. ¶ 86 (citing Hightower Aff. ¶ 6).
We will reject this allegation as based on inadmissible hearsay.

We turn now to the discriminatory language that
Hightower describes at EASD.  According to Hightower, he had a
conversation with Riker and Shoemaker in which the latter two
administrators suggested that Hightower needed experience with a
different population of students to become a viable candidate for
a central office position, Pl.'s Facts ¶ 82 (citing Hightower
Dep. at 173), which Hightower took to mean that he needed to work
with a white population.[13]  Id.  Hightower suggests that he "was
informed by Central Office administrators their belief that
students at Paxinosa could not learn," Id. ¶ 83 (citing Hightower
Dep. at 167-68) -- though the testimony upon which he relies
reveals that he was actually told that "there are also teachers
at Paxinosa School who believe that students can't learn,"
Hightower Dep. at 167, a far more equivocal statement that is, in
any case, an inadmissible unsupported assessment of third

_____

[13] In connection with this incident, Hightower notes
that he was informed that Riker wanted him to take a position as
Principal of Tracy Elementary School, but that this offer was
withdrawn without explanation, and that no white principal was
offered a school and then had the offer rescinded.  Pl.'s Facts ¶
82 (citing Hightower Dep. at 173-76).  Since Hightower offers no
factual basis for this latter statement, we will disregard it.

23

parties' states of mind.  Hightower also claims that EASD Board members falsely accused him of having a sexual relationship with Monroe "because they were both African American."  Pl.'s Facts ¶ 88 (citing Hightower Aff. ¶ 6).  Hightower's declaration, upon which he relies for this allegation, merely notes that in a conversation Hightower had with Myers, Myers told him that two members of the Board spread a rumor that Hightower and Monroe were "making out" in a school parking lot.  Hightower Aff. ¶ 6. We reject this claim as based on inadmissible hearsay.

Both parties agree that after Hightower spoke to McGinley about taking leave, Shoemaker told him, "Well Dave, I spoke to Sue . . . about your FMLA . . . . You're my boy; it's not a problem.  You don't -- well you don't need -- we'll just work you any -- we'll just work out you taking . . . time off when you need the time off."  Def.'s Facts ¶ 53 (ellipses in original); Pl.'s Facts ¶ 53.  Hightower asserts that this quotation "reveals that Mr. Shoemaker used the racist reference 'boy' to refer to Mr. Hightower."  Pl.'s Facts ¶ 53.  Shoemaker also complained about Hightower's eye contact and body posture being "defensive,", id. ¶ 74 (citing Hightower Dep. at 148), and asked Hightower to "look away when I talk to you."  Hightower Dep. at 148.  When Hightower sought the appointment of Hector

24

Bonilla, a minority individual, as Assistant Principal for

Paxinosa, Shoemaker stated before the decision-making committee

that Bonilla would "receive a courtesy interview because

[Hightower] wanted him to be interviewed."[14]  Pl.'s Facts ¶ 78

(citing Hightower Dep. at 192-93).

Hightower's allegations as to Kish's language are more

extensive.  We have already noted Hightower's claim that Kish

advised him as to what to wear to interviews. Id. ¶ 28 (citing

Hightower Dep. at 44), 36.  Hightower suggests that "Kish had a

history of informing black leaders that he would coach black

applicants on what to wear to interviews and how to speak, as if

the applicants would not know."  Id. (citing Ex. 6 to Pl.'s Facts

("Davis Aff.") and Ex. 17 to Pl.'s Facts ("Fennell Aff.") at

P000295).  Hightower also avers that Kish "informed him that a

black applicant was a drug addict with no basis."  Id. ¶ 36

(citing Hightower Dep. at 177).  Hightower identifies as further

racist conduct Kish's response to his complaints that EASD was

resegregating its schools.  According to Hightower, Kish "smugly

sa[id], "[S]o what?  So what are you gonna do about it?'" Id. ¶

---

[14]  Notwithstanding this comment, which Hightower
described as "racially biased," Hightower Dep. at 194, Bonilla
was ultimately hired as Assistant Principal.  Id.

36 (quoting Hightower Dep. at 78).  Hightower also notes that, in
a meeting with Shoemaker and Kish he was directed to suspend a
teacher without pay and when he noted that he lacked such
authority, Kish responded, "[W]ell, you're chicken shit because
you're not gonna suspend her for one day."  Id. ¶ 57 (citing
Hightower Dep. at 154-55).  In conversations with the head of the
local NAACP and the senior pastor of the Great Shiloh Church of
Easton, Kish suggested, when asked about hiring African Americans
for non-teaching positions, that "we've got enough minority
janitors -- we're OK."  Id. ¶ 77 (citing Fennell Aff. ¶ 14).
During these conversations, Kish also noted that "[i]n the
Philadelphia school district, they have many black teachers but
the school system is in trouble . . . so hiring black teachers
for EASD is not the answer."  Davis Aff. (ellipsis in original).

    As for racial epithets, Hightower himself never
personally heard Kish use such language, Def.'s Facts ¶ 36; Pl.'s
Facts ¶ 36, nor does he allege that he heard Coxe use such terms.
Hightower notes that Ransom informed him that Kish and Coxe
referred to black employees as "niggers," Pl.'s Facts ¶ 37
(citing Hightower Dep. at 39), but since this statement relies on
inadmissible hearsay, we cannot consider it.

Hightower does present a wealth of other, direct testimony on this topic, however.  Tina Rosado, a security guard at EASD, testified in her deposition that Kish used the terms "nigger," "those people," "spooks," and "monkeys" to refer to minorities.[15]  Id. ¶ 73 (citing Ex. 27 to Pl.'s Facts ("Rosado Dep.") at 35-36).  Kish's secretary, Marie Lynn Smith, testified that Kish used the words "niggers" and "spics" in the workplace.  Ex. 18 to Pl.'s Facts ("Smith Dep.") at 31-32.  Coxe admitted in a deposition that he may have heard Kish use the word "nigger" in the workplace.  Id. ¶ 70 (citing Ex. 24 to Pl.'s Facts ("Coxe Dep. II") at 62-64).  And, according to an affidavit by Roger Herstich, a security guard at EASD, he heard Kish say to Coxe, "That's why this nigger will never go anywhere in this school district, not while I'm here" -- apparently in reference to Hightower.[16]  Id. ¶ 71 (citing Ex. 7 to Pl.'s Facts ("Herstich Aff.") ¶ 4).  Herstich also notes that he heard Coxe say "I have

---

[15] Hightower also claims that according to Rosado, Kish would speak about handling "minority kids" roughly.  Pl.'s Facts ¶ 73 (citing Rosado Dep. at 21-22).  Rosado's testimony actually states that she "heard Joe brag about what he did to children when he was the principal at the middle school," with no mention of the race of the children.  Rosado Dep. at 22.

[16] Though Herstich does not specify the grounds from which he deduced that this comment referred to Hightower, we will infer that context clues permitted such a deduction.

27

to go now, I have to deal with this lazy nigger," shortly before Ransom was to report to Coxe's office for a disciplinary meeting. Id. (citing Herstich Aff. ¶ 5).

Finally, Hightower presents testimony from a variety of deponents attesting that Kish was "racist." Id. ¶ 37. Hightower testified that Riker informed him that Kish was racist, id. (citing Hightower Dep. at 57-58), and that Myers told him that "black employees were expected to respond to Mr. Kish by saying 'yes, Massa, yes, Massa.'" Id. (citing Hightower Aff. ¶ 3). Even if these statements were not based on inadmissible hearsay -- which they palpably are -- we would reject them as unsupported subjective opinions. Hightower also presents testimony from Gregory Annoni suggesting that he heard from other people that Kish and Coxe made comments of a racist nature, id. (citing Ex. 29 to Pl.'s Facts ("Annoni Dep.") at 20-21), again, textbook hearsay.

Hightower lastly notes that he complained to Monroe about Kish's racist behavior, id. (citing Monroe Dep. at 37). While we may consider this statement as revealing of Hightower's actions, it has no probative value regarding the behavior as to which Hightower complained.

28

### 3.   Hightower's Complaints to EASD

Hightower states that he registered complaints with EASD administrators about much of the conduct alleged above.  In particular, he complained about the discriminatory character of:

- the Minority List and Courtesy Interview Memo to Donaldson and Riker in 2007, id. ¶ 5 (citing Hightower Dep. at 26-29); the Board's discriminatory policy as to FMLA leave and Kish's racist behavior to Monroe at some point before May of 2008, id. (citing Monroe Dep. at 32, 37);

- Kish and Coxe's racist behavior to Castrovinci, id. (citing Castrovinci Dep. at 64-66);

- Shoemaker's suggestion that Bonilla receive a "courtesy interview" to McGinley in July of 2008, id. (citing Hightower Dep. at 194; McGinley Dep. at 93-94); and

- EASD's redistricting policy at a principals' meeting which Shoemaker and Kish attended in the spring of 2008, id., suggesting that "this is segregating the school district."  Hightower Dep. at 76.

Hightower also complained about a variety of other conduct, though his references to the record do not suggest that he told anyone that this conduct was discriminatory. Specifically, Hightower complained about:

- "harassment"[17] by Shoemaker at some point before March of 2007 to Riker, id. (citing Riker Dep. at 19-21);

- Kish's "racist behavior"[18] in 2006 to Riker, id. (citing Riker Dep. at 21-24; Hightower Dep. at 57-58);

- Kish's identification of a black job applicant as a drug addict to Hightower,[19] id. (citing Hightower Dep. at 177-78);

_____

[17] Riker's testimony actually reveals that Hightower "indicated that Mr. Shoemaker's goals were very aggressive and at times may not be obtainable," but that he never "use[d] the word unfairly treated." Riker Dep. at 21.

[18] Riker's testimony actually reflects that Hightower only "comment[ed]" about Kish's "aggressive" leadership style. Riker Dep. at 24. Hightower's own testimony merely records that Riker himself suggested Kish was a racist to Hightower, and does not include Hightower's response. Hightower Dep. at 57-58.

[19] Hightower's testimony suggests he did not complain to Kish about his comment or identify it as discriminatory, but instead only asked "Joe, how do you know he's a drug addict? How do you know he's on drugs?" Hightower Dep. at 177.

30

- "improper treatment"[20] regarding the Board's FMLA leave policy to the Board in June of 2008, id. (McGinley Dep. at 101-02; Ex. 25 to Pl.'s Facts ("E-mail to Board"));

- Paxinosa's move to a dilapidated, inner-city building[21] to McGinley in October of 2008, id. (citing Ex. 8 to Pl.'s Facts ("E-mail to McGinley"));

- Kish's failure to approve[22] requests for the provision of basic building and grounds maintenance to Paxinosa Elementary School to McGinley in May of 2010, id. (citing McGinley Dep.

---

[20] Though Hightower suggests that he complained to the EASD Board in an e-mail, the e-mail itself reveals that he only described the medical conditions necessitating FMLA leave while noting that he "did not feel comfortable" placing this "sensitive information" in correspondence.  E-mail to Board.

[21] Hightower's e-mail shows that he expressed discontent with the fact that "no members involved in this process ever stated that we were permanently being relocated" over the course of "numerous meetings."  E-mail to McGinley.

[22] The record demonstrates only that Hightower "complain[ed] about items not being present in the bottom level of the building as listed on Exhibit 42," McGinley Dep. at 121, and that he requested that McGinley "review the enclosed information regarding 'Building Renovations and Furniture Needs' within Paxinosa Elementary School."  Memo to McGinley.

31

at 121; Ex. 30 to Pl.'s Facts ("Memo to
McGinley"));

- Shoemaker's treatment[23] of Hightower at a meeting
  to Castrovinci in July of 2008, id. (citing Ex. 26
  to Pl.'s Facts ("Memo to Castrovinci")); and

- acts[24] in May of 2010, by individuals Kish
  supervised, to Castrovinci, id. (citing Ex. 28 to
  Pl.'s Facts ("Memo II to Castrovinci")).

### 4.   Harassment of Hightower at EASD

Lastly, we consider Hightower's allegations as to the
harassment he suffered in retaliation for making the complaints
we just canvassed.  Hightower first suggests that EASD failed to
promote him in retaliation for these complaints, id.  We have
already listed the ways in which the District allegedly failed to

---

[23] In Hightower's memo, he primarily complained that at
a meeting Shoemaker made comments "regarding my attendance [that]
directed the focus of the meeting toward me and my
professionalism with teachers and the meeting turned into a
personal intervention session about David Hightower," and that
"the comments made by Mr. Shoemaker in that forum were demeaning
to me as a professional."  Memo to Castrovinci.

[24] In Hightower's memo, he complained about a
memorandum regarding community relations that he found to be
"unnecessary and demeaning"; a dispute over Hightower's authority
to rescind attendance notification letters; and a dispute over
his authority to set dress codes.  Memo II to Castrovinci.

promote Hightower.  See supra Parts I.A & I.B.1.  Hightower also
argues that the District, with a retaliatory motive, required him
to provide information to the Board in connection with his FMLA
leave request, Pl.'s Facts ¶ 5.  We have recounted this series of
events, as well.  See supra Part I.B.2.  Finally, Hightower
claims that he was disciplined and humiliated as a result of his
complaints about discrimination.  Pl.'s Facts ¶ 5.  This claim
involves some allegations we have already rehearsed, such as that
Shoemaker required Hightower to meet with him to discuss articles
and that Kish called him "chicken shit."  See supra Part I.B.2.
It also rests on another allegation: that Shoemaker pulled him
out of a meeting[25] "in front of all his direct reports" and then
administered discipline "loudly in an adjoining room."  Pl.'s
Facts ¶ 91 (citing Hightower Dep. at 146-47).  But the record
reveals a different interaction.  According to Hightower's
testimony, "[Shoemaker] took me out of a meeting at the middle
school to take me into an adjoining room within the library to
meet with me for about two hours, two and a half hours to talk

---

[25] Hightower relies on McGinley's deposition for the
proposition that "this action was totally inappropriate," Pl.'s
Facts ¶ 91, but McGinley's testimony as to this point was based
on a hypothetical question, and in any case merely expressed her
subjective and inadmissible opinion.  McGinley Dep. at 132.

about the article that he said that I had a meeting with him to read."  Hightower Dep. at 146.

## II.  __Analysis__

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," Adderly v. Ferrier, 419 Fed. Appx. 135, 136 (3d Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial."  Id.  "'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,'" J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 2011 WL 2305973, at *6 (3d Cir. 2011) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff."  Bialko v. Quaker Oats Co., 2011 WL 2550416, at *1, n.4 (3d Cir. 2011) (quoting Anderson v.

34

Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)) (bracketed

material in original).   As already noted, we "draw all

reasonable inferences in favor of the nonmoving party, and [we]

may not make credibility determinations or weigh the evidence."

Eisenberry, 421 Fed. Appx. at 241 (quotation marks omitted).

### A.    **Hightower's Hostile Work Environment Claim**

In his complaint, Hightower alleges that he was

subjected to a hostile work environment.   This was the

consequence of (1) the District's circulation of the Minority

List and Courtesy Interview Memo; (2) racist statements by EASD

administrators; (3) the move of Paxinosa Elementary School to an

ill-equipped building in an urban setting and general re-

segregation at EASD; (4) the District's failure to consider

Hightower for the positions of Director of Human Resources,

Director of Support Programs, and Superintendent; (5) EASD's

requirement that Hightower report his confidential medical

information to members of the Board; (6) Shoemaker's requirement

that Hightower read articles and meet with Shoemaker

individually; and (7) public discipline and humiliation of

Hightower by EASD administrators.   Pl.'s Compl. ¶ 13.   We will

presume, based on Hightower's statement of facts, that he also

35

predicates his hostile work environment claim on (8) the
District's alleged practice of delivering disciplinary notices to
black employees by armed guard, and (9) its refusal to allow
Hightower to manage his own staff at his school.  Pl.'s Facts ¶
76, 85-86.  The District responds that "Plaintiff cannot show
that he was intentionally discriminated against based on his
race; that the discrimination was pervasive and regular (let
alone 'severe or pervasive' under Clark County Sch. Dist.) and;
that the alleged discrimination would detrimentally affect a
reasonable person of the same race."  Def.'s Br. in Support of
Mot. for Summ. J. ("Def.'s Br.") at 9.

Both the PHRA[26] and Title VII make it "an unlawful
employment practice for an employer . . . to fail or refuse to
hire or to discharge any individual, or otherwise to discriminate
against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."  42
U.S.C. § 2000e-2(a)(1).  Courts have interpreted this section to

--------

[26] As our Court of Appeals has noted, "[t]he proper
analysis under Title VII and the Pennsylvania Human Relations Act
is identical, as Pennsylvania courts have construed the
protections of the two acts interchangeably."  Weston v.
Pennsylvania, 251 F.3d 420, 425 n.3 (3d Cir. 2001).

provide for both hostile work environment claims and
discrimination claims, with the Supreme Court "recogniz[ing] that
Title VII's protection is not limited to 'economic' or 'tangible'
discrimination, such as the denial or loss of a job or promotion.
It is violated as well by a 'work environment abusive to
employees because of their race, gender, religion, or national
origin.'" West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir.
1995) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22
(1993)).  The Supreme Court has further observed that "[a]
tangible employment action constitutes a significant change in
employment status, such as hiring, firing, failing to promote,
reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits." Burlington
Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Since the
move of Paxinosa Elementary School to an older, inner-city
building and the District's failure to promote Hightower would
each constitute such an action, we will consider Hightower's
arguments as to the move and the failure to promote  -- that is,
the third and fourth bases he raises above -- in the next
section, when we deal with his discrimination claims.

As our Court of Appeals has explained, "to establish a
prima facie hostile work environment claim under Title VII or the

PHRA, a plaintiff must show that (1) the employee suffered intentional discrimination because of his race, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of respondeat superior liability." Woodard v. PHB Die Casting, 255 Fed. Appx. 608, 609 (3d Cir. 2007) (brackets and internal quotation marks omitted). Importantly, "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim.  Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" Caver v. Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (internal citations omitted) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  Moreover, "[i]n determining whether the conduct at issue is sufficiently extreme, we consider the 'totality of the circumstances.' . . . The types of circumstances we consider 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 262-63 (quoting Harris, 510 U.S. at 23).  Fundamentally,

"[t]o prove his hostile work environment claim, [a plaintiff] must show, <u>inter alia</u>, that his workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" <u>Perry v. Harvey</u>, 332 Fed. Appx. 728, 730-31 (3d Cir. 2009) (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002).

Based on these standards, we will reject the first, sixth, seventh, and ninth bases upon which Hightower predicates his hostile environment claim as insufficient to "create an abusive work environment." <u>Id.</u>  Though we are mindful that we must consider the totality of the circumstances in analyzing a hostile work environment claim, we cannot conceive of any reasonable jury finding that these alleged actions contributed to such an environment.  Thus, although EASD's circulation of the Minority List and Courtesy Interview Memo may have upset Hightower, he has not alleged that they affected his work environment in any way.  Similarly, Shoemaker's requirement that Hightower discuss articles with him do not appear to have involved "intimidation, ridicule, [or] insult," <u>id.</u>; Hightower does not suggest that these meetings were anything but civil.  As for the discipline and alleged humiliation that Hightower

suffered, these appeared to consist of (1) a courteously worded written request from Shoemaker that Hightower try to communicate future scheduling conflicts, (2) an occasion on which Shoemaker pulled Hightower out of a meeting to discuss an article in the library for a couple of hours, and (3) a meeting in which Kish called him "chicken shit."  Of these, the third is the most serious, but even it appears to involve only a "mere offensive utterance."  Caver, 420 F.3d at 263.  Finally, with respect to his ninth point, Hightower only suggests that he was not allowed to install a buzzer for a security guard who had trouble walking or to move a security officer from one office in his building to another.  This limitation of Hightower's capacity to manage his staff was not so "'extreme [as] to amount to a change in the terms and conditions of employment.'"  Id. at 262.

        We are thus left with the second, fifth, and eighth bases for liability that Hightower identifies.  We begin with the second basis -- alleged racist statements EASD administrators made.  Of these statements, we have already rejected several as founded on inadmissible hearsay.[27]  We may discard others as so

_____

        [27] To review, these statements included: the assertion that some teachers at Paxinosa School believed that students can't learn; false accusations by EASD Board members of a sexual
                                                        (continued...)

neutral in import that they could not reasonably be taken as

"intimidation, ridicule [or] insult," <u>Perry</u>, 332 Fed. Appx. at

730-31: namely, Riker and Shoemaker's recommendation that

Hightower needed experience with a different population of

students; Shoemaker's suggestion that Bonilla receive a courtesy

interview to satisfy Hightower; Kish's advice as to what

Hightower should wear to an interview; and Kish's allegedly smug

challenge, "So what are you gonna do about it?," Pl.'s Facts ¶

36, when Hightower complained of re-segregation at EASD.  We also

reject Shoemaker's allegedly racist use of the word "boy" in

reference to Hightower.  As our Court of Appeals has explained,

even if we accept Hightower's "requested inference that 'boy' was

a racially motivated epithet, it does not rise above an offhanded

comment or sporadic abusive language."  <u>Perry</u>, 332 Fed. Appx. at

732 (internal quotation marks, citations and ellipses omitted).

Even with these eliminations, we are still left with a

trove of allegedly racist language, to wit: Shoemaker's request

that Hightower "look away when I talk to you," Hightower Dep. at

148; Kish's claim to Hightower that a black applicant was a drug

---

[27](...continued)
relationship between Hightower and Monroe; and the suggestion by
Ransom to Hightower that Kish and Coxe used the term "niggers."

addict; Kish's statement to local leaders that EASD had "enough minority janitors", Pl.s' Facts ¶ 77, and "hiring black teachers for EASD is not the answer," Davis Aff., and rampant use of slurs such as "nigger," "spook," "monkey," and "spic" by Kish and Coxe -- including Kish's alleged statement that "this nigger will never go anywhere in this school district, not while I'm here" in reference to Hightower.[28]  Pl.'s Facts ¶¶ 71-73.  We may combine these allegations with the fifth and eighth bases for hostile environment liability that Hightower identifies -- the requirement that Hightower report confidential medical information to the Board, and the Board's alleged practice of delivering disciplinary notices to black employees by armed guard -- as the only admissible allegations that survive an initial screening for conditions that could not possibly contribute to a "severe" and "pervasive" alteration of Hightower's working environment.  Perry, 332 Fed. Appx. at 730-31.

However, our Court of Appeals has noted that a plaintiff "cannot meet the first element of the hostile work environment claim under Title VII . . . solely by pointing to

---

[28] We recall that the parties agree that Hightower never heard Kish use a racial epithet, Def.'s Facts ¶ 36; Pl.'s Facts ¶ 36.  It also bears noting that Hightower presents no evidence suggesting he ever heard Coxe use such an epithet.

comments that were directed at other individuals," Caver, 420 F.3d at 263 (emphasis in original), although racist comments directed to others "may be considered in determining whether facially neutral conduct on the part of [a defendant] was actually based on [a plaintiff's] race." Id. at 264. This admonition must similarly apply to intimidating or harassing actions taken against other individuals, since such actions would otherwise give rise to viable hostile environment claims by any co-worker of those individuals who learned of these actions. We thus must consider whether the remaining allegations as to comments and actions aimed directly at Hightower -- when considered in light of other evidence of racially hostile comments and actions -- state a claim for Title VII harassment.

We run into a problem when attempting to characterize the remarks Kish allegedly made, using racial epithets about Hightower. Hightower suggests that "[c]aselaw does not require a plaintiff to have actually heard a discriminatory comment about him from the maker in order for it to be part of a hostile work environment," Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Br.") at 5, and quotes Williams v. Pennsylvania State Police, 481 F. Supp. 2d 424, 429 (W.D. Pa. 2007) (internal quotation marks and brackets omitted), for its proposition that

43

"racial epithets need not be hurled at the plaintiff in order to contribute to a working environment that is racially hostile." But Williams goes on to explain that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult, without limiting this concept to intimidation or ridicule explicitly racial in nature." Id. (internal quotation marks and ellipsis omitted). Williams thus stands only for the proposition that harassment need not be explicitly racial for it to be actionable under Title VII; it does not hold that this harassment need not be directed at the plaintiff.

Hightower might argue that comments about him are directed at him, but such an interpretation fails to comport with the common definition of directed[29] and its sense that the thing directed was purposefully pointed at the recipient. We note further that our Court of Appeals has explained, in discussing hostile work environment claims, that "[a]ll that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white she would not have been treated in the same manner." Aman v. Cort Furniture Rental

---

[29] "Aimed, addressed, guided, etc."  IV Oxford English Dictionary 704 (2d ed. 1989).

Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) (emphasis added).  This

language seems to us dispositive of the question: a comment

exchanged between two individuals in confidence cannot be

considered to be "treatment" of a third individual.  Kish's

alleged comment to Coxe about Hightower, then, cannot by itself

support a hostile environment claim.

The actions and comments that Hightower alleges were

directed at him, and hence constituted mistreatment of him,

consist of: Shoemaker's request that Hightower look away during a

conversation, Kish's claim to Hightower that an African-American

job applicant was a drug addict, and the Board's requirement that

Hightower on one occasion provide medical information to it

before he took FMLA leave.  Even if we rely on Kish's and Coxe's

alleged use of racial epithets, and the claimed use of armed

guards to deliver disciplinary notices to black employees to

conclude that these actions and comments were racially

motivated,[30] we would not agree that a reasonable jury could find

that this treatment altered Hightower's conditions of employment.

_____

[30] Such a deduction would be problematic, since
Hightower does not identify who allegedly ordered that Monroe
should be escorted from her office by armed guards after she was
released from her position.  Discriminatory actions and comments
by Kish and Coxe do not establish discriminatory motivation by
Shoemaker or the EASD Board.

We do not deny that this treatment, <u>in combination</u> with circumstances not present here, <u>might</u> support a hostile work environment claim.  But by themselves two comments with possibly racist overtones and a one-time requirement that Hightower provide medical information to the Board cannot "create an abusive working environment."  <u>Perry</u>, 332 Fed. Appx. at 731.  We will thus grant summary judgment on Count I of Hightower's complaint.

### B.   **Hightower's Discrimination Claim**

Hightower's complaint states that he was discriminated against based on his race in three ways: (1) he was not promoted to the positions of Director of Human Resources in 2002 and 2007, Director of Support Programs in 2007, and Superintendent in 2008, though he applied for these positions, Pl.'s Compl. ¶ 16, 18-20; (2) Shoemaker subjected him to discipline by requiring him to read articles and report on them, <u>id.</u> ¶ 17; and (3) he was required to provide medical information to the EASD Board in order to apply for FMLA leave.  <u>Id.</u> ¶ 23.  As we noted in the previous section, we will consider his allegations that EASD moved his school to an older, inner-city building as made in support of his discrimination claim as well.  We will also

46

consider in this section Hightower's claims that the District
selected Donaldson as Director of Human Resources in 2003 or
2004, without advertising the position, Pl.'s Facts ¶ 14, and
later placed Castrovinci in this position without advertising it.
Id. ¶ 22.  Defendant responds that Hightower's claims as to his
earlier applications are beyond the statute of limitations,
Def.'s Br. at 7, and that he has neither presented direct
evidence of discrimination nor set forth evidence impugning
EASD's reasons for not hiring him for certain positions.  Def.'s
Br. at 19-20.

        We will first dispose of the statute of limitations
issue.  42 U.S.C. § 2000e-5(e)(1) provides that

>       [I]n a case of an unlawful employment
>       practice with respect to which the person
>       aggrieved has initially instituted
>       proceedings with a State or local agency with
>       authority to grant or seek relief from such
>       practice or to institute criminal proceedings
>       with respect thereto upon receiving notice
>       thereof, such charge shall be filed by or on
>       behalf of the person aggrieved within three
>       hundred days after the alleged unlawful
>       employment practice occurred.

Hightower alleges in his complaint, without contradiction from
EASD, that he filed a complaint with the Pennsylvania Human
Relations Commission on September 5, 2008.  Pl.'s Compl. ¶ 5;
Def.'s Ans. ¶ 5.  Both parties also agree that he applied for the

47

position of EASD Superintendent on March 20, 2008 and did not get

this position.  Def.'s Facts ¶¶ 30, 32.  Since this latter

incident occurred within the filing period, we must determine

whether it is so related to the 2002 or 2003-04 incidents as to

bring those first incidents within the statute of limitations.

> Our Court of Appeals has explained that
>
> [A] plaintiff may pursue a Title VII claim
> for discriminatory conduct that began prior
> to the filing period if he can demonstrate
> that the act is part of an ongoing practice
> or pattern of discrimination of the
> defendant. . . . To establish that a claim
> falls within the continuing violations
> theory, the plaintiff must do two things.
> First, he must demonstrate that at least one
> act occurred within the filing period. . . .
> Next, the plaintiff must establish that the
> harassment is more than the occurrence of
> isolated or sporadic acts of intentional
> discrimination.

West, 45 F.3d at 754-55 (internal quotation marks and citations

omitted).  In this case, we have little difficulty in concluding

that the alleged 2002 and 2003-04 violations of Title VII do not

fall within the continuing violations theory.  Aside from these

two incidents, all of the allegedly discriminatory actions that

Hightower describes took place in or after 2007.[31]  This three-

---

[31] In addition to the failures to promote in 2007 and
2008, Hightower claims that the District moved Paxinosa

(continued...)

to-four-year gap renders the earlier incidents temporally

"isolated," id., and hence barred by the limitations period.

We have already observed that Title VII and the PHRA

bar an employer from "economic" or "tangible" discrimination

against an individual, West, 45 F.3d at 753, "because of such

individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2(a)(1).  According to the Supreme Court,

moreover, a "tangible employment action constitutes a significant

change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in

benefits."  Burlington Indus., Inc., 524 U.S. at 761.  We can

thus immediately reject Hightower's discrimination claim based on

Shoemaker's requirement that Hightower read articles and report

to him and Shoemaker's alleged consequent discipline, as well as

Hightower's claim based on the Board's alleged demand that he

submit confidential medical information to it before taking FMLA

---

[31](...continued)
Elementary School in 2008, Hightower Dep. at 66, and that
Shoemaker began requiring him to report on articles at individual
meetings at some point after May of 2008.  Hightower Dep. at 143-
44 (noting that Shoemaker instituted one-on-one meetings with
Hightower after he complained to "superintendent McGinley" about
Shoemaker's conduct); Pl.'s Facts ¶ 34 (stating that McGinley
became Acting Superintendent in May of 2008).

leave.[32]  Shoemaker's reading requirement clearly does not rise to the level of a tangible employment action, and while the Board's alleged FMLA information requirement might have affected the process whereby Hightower secured leave, it did not "change" his entitlement.

A plaintiff asserting a Title VII discrimination claim may do so either under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or the two-step framework of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Under McDonnell Douglas, a Title VII plaintiff must first carry

> the initial burden under the statute of establishing a prima facie case of racial discrimination.  This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[33] . . . The burden then must

---

[32] We have already considered both of these alleged actions as possible predicates for a hostile work environment claim under Title VII and the PHRA.

[33] Our Court of Appeals has cautioned that "courts need not, and should not, stubbornly analyze all Title VII factual scenarios through the McDonnell Douglas formula.  Instead, courts must be sensitive to the myriad of ways such an inference can be

(continued...)

> shift to the employer to articulate some
> legitimate, nondiscriminatory reason for the
> employee's rejection.

411 U.S. at 802.  Our Court of Appeals has emphasized that only

> the burden of <u>production</u> shifts to the
> defendant to articulate some legitimate,
> nondiscriminatory reason for the employee's
> rejection.  The employer satisfies its burden
> of production by introducing evidence which,
> taken as true, would permit the conclusion
> that there was a nondiscriminatory reason for
> the unfavorable employment decision.  The
> employer need not prove that the tendered
> reason <u>actually</u> motivated its behavior, as
> throughout this burden-shifting paradigm the
> ultimate burden of proving intentional
> discrimination always rests with the
> plaintiff.

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis in

original) (internal quotation marks and citations omitted).  To

survive a motion for summary judgment once the defendant has

carried its burden of production,

> the plaintiff generally must submit evidence
> which: 1) casts sufficient doubt upon each of
> the legitimate reasons proffered by the
> defendant so that a factfinder could
> reasonably conclude that each reason was a

_____

[33](...continued)
created.  Simply stated, a Title VII plaintiff has established a
prima facie case when sufficient evidence is offered such that
the court can infer that if the employer's actions remain
unexplained, it is more likely than not that such actions were
based on impermissible reasons."  <u>E.E.O.C. v. Metal Serv. Co.</u>,
892 F.2d 341, 348 (3d Cir. 1990).

> fabrication; or 2) allows the factfinder to
> infer that discrimination was more likely
> than not a motivating or determinative cause
> of the adverse employment action.

Id. at 762.

In contrast, in Price Waterhouse, 490 U.S. at 271

(O'Connor, J., concurring),[34] the Supreme Court held an employer

is not entitled to face only a burden of production, with its

"presumption of good faith[,] where there is direct evidence that

it has placed substantial reliance on factors whose consideration

is forbidden by Title VII."  As the Court elaborated,

> [I]n order to justify shifting the burden on
> the issue of causation to the defendant, a
> disparate treatment plaintiff must show by
> direct evidence that an illegitimate
> criterion was a substantial factor in the
> decision. . . . [W]here a plaintiff has made
> this type of strong showing of illicit
> motivation, the factfinder is entitled to
> presume that the employer's discriminatory
> animus made a difference to the outcome,
> absent proof to the contrary from the
> employer.  Where a disparate treatment
> plaintiff has made such a showing, the burden
> then rests with the employer to convince the
> trier of fact that it is more likely than not
> that the decision would have been the same
> absent consideration of the illegitimate
> factor.  The employer need not isolate the

---

[34] Our Court of Appeals has "recognized that Justice
O'Connor's opinion concurring in the judgment represents the
holding of the fragmented Court in Price Waterhouse."  Fakete v.
Aetna, 308 F.3d 335, 337 n.2 (3d Cir. 2002).

> sole cause for the decision; rather it must
> demonstrate that with the illegitimate factor
> removed from the calculus, sufficient
> business reasons would have induced it to
> take the same employment action.

Id. at 276. Our Court of Appeals has noted that once a plaintiff presents "direct evidence" of discrimination, "the burden of persuasion on the issue of causation shifts" to the employer. Fakete, 308 F.3d at 338 (emphasis added), and has observed that "[o]ne form of evidence sufficient to shift the burden of persuasion under Price Waterhouse is statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, even if the statements are not made at the same time as the adverse employment decision." Id. at 339 (internal quotation marks omitted); see also Carroll v. Tompkins Rubber Co., 1993 WL 195472, at *5 (E.D. Pa. 1993) ("In the Title VII context, a plaintiff typically presents [direct] evidence in the form of racially derogatory statements his supervisors have made.").

EASD argues that Hightower "has not presented any direct evidence of discrimination," Def.'s Br. at 19, and thus tries to explain why Hightower's discrimination claims fail under McDonnell Douglas. Id. at 19-21. But Hightower has presented direct evidence of discriminatory animus, in the form of an

53

alleged statement by Kish to Coxe about Hightower: "That's why this nigger will never go anywhere in this school district, not while I'm here."  Herstich Aff. ¶ 4.  It would be difficult to imagine more damning direct evidence of discriminatory motivation.

With support in the record, Hightower has also alleged that Kish participated in the hiring process for the positions of Director of Human Resources and Director of Support Programming in 2007.  Pl.'s Facts ¶¶ 18, 24.  Hightower also states that the Board participated in selecting the EASD Superintendent in 2008, and that Kish generally intimidated members of the Board, id. ¶¶ 31, 60 -- though he presents no evidence that Kish directly participated in this selection process.  It is generally true that "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight" in analyzing discrimination claims, Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 333 (3d Cir. 1995), though the Supreme Court has inferred under certain circumstances that a dominant officer at an organization likely participated in all employment decisions.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 152 (2000) (concluding that officer was actual decisionmaker based on marriage to formal decisionmaker, practice

of berating other company directors, and testimony that all
employees feared the officer and that the officer exercised
"absolute power").  Even drawing the appropriate inferences in
Hightower's favor, we cannot conclude that the mere fact that
Kish intimidated EASD Board members means that he influenced all
their hiring decisions.  In the absence of direct evidence of
discriminatory animus by those who participated in the decision-
making process, we will analyze the 2008 selection of McGinley as
the Superintendent under McDonnell Douglas, not Price
Waterhouse.[35]

Turning back to the 2007 selections, under Price
Waterhouse, 490 U.S. at 276, the burden of persuasion thus shifts
to the District to "demonstrate that with the illegitimate factor
removed from the calculus, sufficient business reasons would have
induced it to take the same employment action."  The District
attempts to carry its burden with respect to the 2007 positions
for which Hightower applied by explaining that: (1) Monroe, an
African-American woman, was hired as Director of Human Resources
in 2007, Def.'s Facts ¶ 21; and (2) "[t]here is no information

---

[35] We will resume this analysis at the end of this
section.

that McGinley was hired for a racially discriminatory reason" as Director of Support Programming in 2007.  Id. ¶ 29.

    With respect to its hire of Monroe in 2007, the District has demonstrated that there is no genuine issue of material fact as to whether Hightower would have been hired in the absence of input from Kish.  Even though Hightower has presented evidence of discriminatory animus against African-Americans on Kish's part, the fact that EASD ultimately hired Monroe, an African-American woman, as Director of Human Resources shows that racial animus cannot have played a determinative role in that process.  The District fails to carry its burden with respect to the selection of McGinley in 2007, however. Hightower's evidence suggesting that he was qualified for central office positions, Pl.'s Facts ¶ 94, and McGinley's status as a non-African-American individual, Def.'s Facts ¶ 27, means that there is genuine dispute in the record as to whether Hightower would have been hired as Director of Support Programming had Kish not participated in the decisionmaking process.

    We conclude our analysis of Hightower's discrimination claims by considering his allegations that (1) Paxinosa Elementary School moved to a different building; (2) Castrovinci was selected as Director of Human Resources in 2008 without the

position being advertised; and (3) the process whereby McGinley

was chosen as Superintendent in 2008 was discriminatory.  Because

Hightower presents little evidence as to the process leading to

the decision to move Paxinosa, we cannot conclude that Kish

participated in this process,[36] and hence cannot employ the Price

Waterhouse framework.  Instead, we must proceed under McDonnell

Douglas.

    For the purposes of EASD's motion, we may dispense with

examining the sufficiency of Hightower's prima facie case and

immediately observe that under the second step of the analysis

the District has "articulate[d] some legitimate,

nondiscriminatory reason," Fuentes, 32 F.3d at 763 (internal

quotation marks omitted), for moving the school: "[T]he reason

the District undertook a re-organization of the schools was to

relieve overcrowding, save School District money and implement a

'neighborhood schools' concept."  Def.'s Facts ¶ 49.  Though

_____

    [36] Hightower does allege that Kish and Shoemaker
attended a principals' meeting on redistricting in the spring of
2008, Hightower Dep. at 76, and in a portion of Kish's deposition
(to which Hightower failed to point us), Kish notes that he "was
on the [redistricting] committee, but it wasn't my
responsibility" to create a final plan.  Kish Dep. at 179.
Without any further information about Kish's part in the
redistricting process, we cannot conclude on this record that he
played a role in the decision to move Paxinosa Elementary School.

Hightower claims that "the School District did not save any money from the redistricting as it still ran the same number of school buses," Pl.'s Facts ¶ 49, he points to no record evidence -- much less dollars and cents calculations -- in support of this contention.  Hightower has thus failed to identify a genuine issue of material fact as to whether the District's reasons for moving Paxinosa were pretextual.

As for the District's choice of Castrovinci as Director of Human Resources, the evidence Hightower presents shows that it was McGinley, in her capacity as Acting Superintendent, who chose Castrovinci for the position.  Castrovinci Dep. at 40.  Since Hightower has offered no direct evidence of discriminatory animus on McGinley's part, we again proceed under McDonnell Douglas.

Though McDonnell Douglas explicitly states that a plaintiff must show that he applied for a position to establish a prima facie case, 411 U.S. at 802, we recall our Court of Appeals's more generous standard that a plaintiff has established "a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." Metal Serv. Co., 892 F.2d at 348 (3d Cir. 1990).  We simply cannot conclude that Hightower has

presented such evidence.  We have already rejected his efforts to
portray Castrovinci as wholly unqualified.  <u>See</u> Pl.'s Facts ¶ 22.
In the absence of <u>some</u> evidence as to Castrovinci's
qualifications or McGinley's motivations, it is not "more likely
than not" that Castrovinci's selection was based on impermissible
reasons.  Because Hightower has not established a <u>prima facie</u>
case, his discrimination claim based on Castrovinci's appointment
must fail.

Lastly, we consider the District's choice of McGinley
as Superintendent in 2008.  We proceed, as noted, under <u>McDonnell
Douglas</u>.  Once again we may skip directly to the second step of
the requisite analysis.  The District asserts that when it hired
McGinley as Superintendent in 2008, she had central office
experience that Hightower did not have.  <u>Id.</u> ¶ 35.  Hightower
concedes this point.  Pl.'s Facts ¶ 35.  Because the District has
thus advanced a legitimate reason for its hiring decision, and
Hightower has identified no genuine issue of material fact as to
whether this reason was pretextual, his discrimination claim
regarding the Superintendent selection process in 2008 cannot
withstand summary judgment.

We will therefore grant EASD's motion for summary
judgment on Count II of Hightower's complaint, but only insofar

as it states a claim for discrimination based on: (1) the
District's failure to promote him to the position of Director of
Human Resources in 2002, 2003-04, 2007, and 2008; (2) Shoemaker's
imposition of reading assignments and discipline upon him; (3)
the Board's alleged requirement that Hightower submit medical
information to it; (4) the District's decision to move Paxinosa
Elementary School to a different building; and (5) EASD's
selection of McGinley as Superintendent in 2008.

C.   **Hightower's Retaliation Claim**

Hightower states, in his complaint, that, as a
consequence of complaints he made about allegedly discriminatory
conduct at EASD, Pl.'s Compl. ¶¶ 25-28, he was publicly
disciplined and humiliated, id. ¶ 30 and the District did not
consider him for promotions.  Id. ¶ 31.  Defendant responds that
"the allegedly discriminatory denial of promotion that Plaintiff
complains of took place significantly prior to any comments made
by Plaintiff," Def.'s Br. at 15, and that Hightower has failed to
show that (1) he engaged in any protected activity under Title
VII, (2) he suffered a materially adverse employment action, or
(3) there is a causal link between his allegedly protected
activity and any allegedly adverse action.  Id. 15-17.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  As our Court of Appeals has explained,

> To establish a prima facie case of
> retaliation, an employee must show that: (1)
> he or she engaged in a protected employee
> activity; (2) the employer took an adverse
> employment action after or contemporaneous
> with the protected activity; and (3) a causal
> link exists between the protected activity
> and the adverse action.  If the employee
> establishes his prima facie case, the
> familiar McDonnell Douglas approach applies
> in which the burden shifts to the employer to
> advance a legitimate, non-retaliatory reason
> for its conduct and, if it does so, the
> plaintiff must be able to convince the
> factfinder both that the employer's proffered
> explanation was false, and that retaliation
> was the real reason for the adverse
> employment action.

Perry, 332 Fed. Appx. at 732 (internal quotation marks and citations omitted).  Our Court of Appeals has elaborated on each of the three elements of the prima facie case.  With respect to protected activity, it has noted that

> [a]n informal complaint may qualify as
> protected activity if it protests what an
> employee believes in good faith to be a
> discriminatory practice.  In other words, a
> retaliation plaintiff must show that he was
> acting under a good faith, reasonable belief

> that a violation existed when he voiced a
> grievance.  To determine if retaliation
> plaintiffs sufficiently opposed
> discrimination, we look to the message being
> conveyed rather than the means of conveyance.
> Although informal complaints may suffice, the
> employee's opposition to unlawful
> discrimination must not be equivocal or
> vague.

Id. at 732-33 (internal quotations marks, citations, and brackets

omitted).  With respect to adverse action, a plaintiff "must show

that a reasonable employee would have found the alleged

retaliatory actions 'materially adverse' in that they 'well might

have dissuaded a reasonable worker from making or supporting a

charge of discrimination.'"  Moore v. City of Phila., 461 F.3d

331, 341 (3d Cir. 2006) (quoting Burlington N. & Santa Fe Ry. Co.

v. White, 126 S. Ct. 2405, 2415 (2006)).  In this regard, our

Court of Appeals has "specifically found oral reprimands not

sufficiently adverse to qualify under the statute."  Weston, 251

F.3d at 430.  Finally, respecting causation, "case law has

focused on two main factors in finding the causal link necessary

for retaliation: timing and evidence of ongoing antagonism."

Abramson v. William Paterson College, 260 F.3d 265, 288 (3d Cir.

2001).  But as the Supreme Court has explained, "cases that

accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

We have already recounted the history of complaints upon which Hightower predicates his retaliation claim. See supra Part I.B.3. As we noted in that discussion, many of Hightower's complaints did not involve any suggestion by him that the complained-of conduct was discriminatory. Because an "employee's opposition to unlawful discrimination must not be equivocal or vague," Perry, 332 Fed. Appx. at 733, these complaints constitute barren ground in which to sow a retaliation claim. As for the adverse action to which Hightower was exposed, we will eliminate the assignments and discipline he allegedly received at Shoemaker's hands because no reasonable jury could find that a few reading assignments and meetings, and a single gently worded admonition about communication, "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341 (internal quotations marks omitted).

We are thus left with the District's repeated failure to promote Hightower as the set of adverse actions that could have constituted retaliation under Title VII. We also have five

occasions on which Hightower allegedly protested that events at the District were discriminatory: his complaints about (1) the Minority List and Courtesy Interview Memo to Donaldson and Riker in 2007; (2) the Board's discriminatory FMLA leave policy to Monroe at some point before May of 2008; (3) Kish and Coxe's racist behavior to Castrovinci at an unspecified time; (4) Shoemaker's suggestion that Bonilla receive a "courtesy interview" to McGinley in July of 2008; and (5) EASD's redistricting policy at a meeting in the spring of 2008 which Shoemaker and Kish attended.

Shifting our focus to causation, Hightower has identified no link between his complaints to Monroe and Castrovinci and any adverse action. His failure to specify more precisely when these complaints were lodged prevents us from inferring causation based on temporal proximity. As for antagonism, Hightower has alleged that Monroe filed her own complaints about discriminatory behavior with the District, Pl.'s Facts ¶ 68, making it most unlikely that she would have sought to retaliate against Hightower for voicing his own complaints to her. Both Castrovinci and Hightower testified that they are personal friends. See Castrovinci Dep. at 64 ("Dave and I are professional colleagues and we are personal friends.");

64

Hightower Dep. at 27 ("I considered him to be a friend.").  Since Hightower has not alleged that either Monroe or Castrovinci conveyed his complaints to anyone with whom he <u>did</u> have an antagonistic relationship, we must reject his complaints as to these two individuals as predicates for unlawful retaliation.

Turning to the Minority List complaint to Donaldson and Riker, Hightower provides few particulars as to when he made this complaint.  In his testimony, he notes that he talked to Castrovinci about the Minority List shortly after he became aware of it, likely in January of 2007, <u>id.</u> at 26-27 -- and in the same general discussion he notes that he talked to Donaldson and Riker about the list as well.  <u>Id.</u> at 26, 28.  Even if we infer that Hightower made his complaint to these latter two people in January of 2007, we know nothing of <u>when</u> he applied for the positions of Director of Human Resources and Director of Support Programming, other than that he applied sometime in 2007.  Pl.'s Facts ¶¶ 16, 23 (citing Hightower Dep. at 96-100).  We can thus infer no causation from temporal proximity between his complaints and his failure to win these positions.  Nor does Hightower allege that antagonism existed between him and either Donaldson or Riker.  In fact, Riker himself testified that he felt the Minority List and Courtesy Interview Memo were discriminatory.

Riker Dep. at 56.  Hightower's complaint to Riker and Donaldson
cannot support a retaliation claim.

       As for Hightower's complaint about Shoemaker's
"courtesy interview" comment to McGinley in July of 2008,
Hightower alleges only one adverse action that followed this
event, i.e., the District's decision to hire McGinley and not him
as Superintendent in August of 2008.  It is true that only one
month elapsed between these events, and that Hightower suggested
in his deposition (albeit without concrete factual support) that
McGinley conveyed his complaint to Shoemaker.  Hightower Dep. at
144.  Even if we inferred that Shoemaker in turn passed this
complaint on to the Board before it chose McGinley -- an
inference that would amount to rank speculation -- the causal
connection between this complaint and the Board's decision not to
hire Hightower would still be ephemeral.  As Hightower concedes,
after soliciting applications for Superintendent the Board
selected McGinley as Acting Superintendent in April or May of
2008, later elevating her to Superintendent.  No reasonable
factfinder could conclude, on this record, that it was
Hightower's complaint about Shoemaker that led the Board to
promote McGinley from Acting Superintendent to Superintendent
instead of choosing Hightower for the position.

66

We are therefore left only with Hightower's complaint at a meeting in the spring of 2008 that EASD's redistricting policy constituted re-segregation. Hightower alleges, with factual support, that Shoemaker and Kish attended this meeting, and our discussion thus far should make clear that the record supports the existence of antagonism between Hightower and Kish, and possibly between Hightower and Shoemaker. Hightower's complaint was voiced shortly before the Board selected McGinley as Acting Superintendent over Hightower, and we may (generously) infer that either Shoemaker or Kish conveyed this complaint to the Board. On a plaintiff-friendly reading of the facts, we could conclude that Hightower has succeeded in making out a prima facie case of retaliation, though only with respect to his redistricting complaint and the Board's decision not to hire him as Acting Superintendent.

But as we have already explained, the District proffers a legitimate, non-discriminatory reason for its selection of McGinley over Hightower: she had central office experience that he lacked. Def.'s Facts ¶ 36. Indeed, Hightower concedes this point, Pl.'s Fact ¶ 36, though he also attempts to rely on unsupported subjective opinions suggesting that McGinley's hiring was unfair. We have already rejected these opinions, and

Hightower comes forth with no other evidence challenging the District's proffered reason.  As a result, this last basis for a retaliation claim fails to clear the summary judgment hurdle.  We will grant summary judgment on Count III of Hightower's complaint.

D.   **Hightower's Claim for Punitive Damages**

Hightower seeks punitive damages against EASD for each of his claims under Title VII and the PHRA, Pl.'s Compl. at 5, 6, 8, to which EASD responds that "public school districts are considered municipal entities within the rule that punitive damages are not recoverable against municipalities or municipal subdivisions under federal law."  Def.'s Br. at 21-22.  As Judge Pollak has explained, "when the employer is a municipality, punitive damages are not available under Title VII."  Udujih v. City of Phila., 513 F. Supp. 2d 350, 358 (E.D. Pa. 2007) (Pollak, J.).  Similarly, "punitive damages are not available under the PHRA."  Gagliardo v. Connaught Labs., Inc., 311 F.3d 565, 570, n.3 (3d Cir. 2002).  We will therefore grant summary judgment and deny Hightower's prayer for punitive damages.

BY THE COURT:

___\s\Stewart Dalzell

68